UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXPORT DEVELOPMENT CANADA,<br><br>Plaintiff,<br><br>v.<br><br>CUSTOM PRODUCE SALES,<br><br>Defendant. | No. 1:21-cv-00684-DAD-SKO<br><br>ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION, DENYING DEFENDANT'S MOTION TO DISMISS, AND STAYING THIS CASE<br><br>(Doc. No. 8) |

This matter is before the court on the motion to compel arbitration and to dismiss filed by defendant Custom Produce Sales ("Custom") on May 21, 2021.[1] (Doc. No. 8.) Pursuant to General Order No. 617 addressing the public health emergency posed by the COVID-19 pandemic, the pending motion was taken under submission on the papers. (Doc. No. 10.) For the

---

[1] The undersigned apologizes for the excessive delay in the issuance of this order. This court's overwhelming caseload has been well publicized and the long-standing lack of judicial resources in this district long-ago reached crisis proportion. While that situation was partially addressed by the U.S. Senate's confirmation of a district judge for one of this court's vacancies on December 17, 2021, another vacancy on this court with only six authorized district judge positions was created on April 17, 2022. For over twenty-two months the undersigned was left presiding over approximately 1,300 civil cases and criminal matters involving 735 defendants. That situation resulted in the court not being able to issue orders in submitted civil matters within an acceptable period of time and continues even now as the undersigned works through the predictable backlog. This has been frustrating to the court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

1

reasons explained below, the court will grant defendant's motion to compel arbitration, but will stay rather than dismiss this case.

## BACKGROUND

Defendant Custom is a fresh produce distributor. (Doc. No. 1 at ¶ 10.) Non-party Imex Argo Inc. ("Imex") is a fresh produce wholesaler that provided weekly shipments of mandarins to Custom between May and July 2020. (*Id.* at ¶ 11.) Custom is located in Parlier, California and Imex is located in Gatineu, Canada. (Doc. No. 8 at 2.) During the above timeframe, Imex shipped mandarins with a total price of $1,168,843 to Custom in fulfillment of orders placed by Custom. (Doc. No. 1 at ¶ 12.) Custom has not paid Imex for the mandarins. (*Id.* at ¶ 32.)

Plaintiff Export Development Canada ("EDC") insures sellers like Imex against the risk of nonpayment by buyers like Custom. (Doc. No. 15 at 7.) Imex filed an insurance claim with EDC for the price of the fruit in the underlying sale to Custom, which EDC paid. (*Id.*) In exchange, Imex assigned its rights against Custom to EDC. (*Id.*) In its role as the assignee of Imex's rights, EDC brought this action against Custom asserting the following causes of action: (1) breach of contract; (2) action for the price; (3) open book account; (4) account stated; and (5) restitution. (Doc. No. 1.)

Defendant Custom argues that it and Imex have signed an agreement in writing to arbitrate any claims between them. (Doc. No. 8 at 2.) Specifically, defendant asserts that both parties are members of the Fruit and Vegetable Dispute Resolution Corporation ("DRC"), a non-profit, membership-based organization which serves the international wholesale produce trade by providing arbitration services for disputes arising between its members. (*Id.* at 2–3.) Based on this alleged arbitration agreement, defendant Custom seeks an order from this court compelling plaintiff EDC to participate in arbitration and dismissing plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(1) on the grounds that the court lacks subject matter jurisdiction. (*Id.* at 2.) In the alternative, defendant seeks an order staying this action and compelling plaintiff to proceed to arbitration. (*Id.*) Defendant filed its motion to dismiss and to compel arbitration on May 21, 2021. (Doc. No. 8.) On July 7, 2021, plaintiff filed an opposition to defendant's motion. (Doc. No. 15.) On July 14, 2021, defendant filed its reply thereto. (Doc. No. 18.)

**LEGAL STANDARD**

**A.     Motion to Dismiss Under Rule 12(b)(1)**

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to seek dismissal of a claim or lawsuit by asserting the defense of lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "If the court determines at any time that it lacks subject matter-jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). "Dismissal for lack of subject matter jurisdiction is appropriate if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984–85 (9th Cir. 2008). "Although the defendant is the moving party in a motion to dismiss brought under Rule 12(b)(1), the plaintiff is the party invoking the court's jurisdiction." *Brooke v. Kashl Corp.*, 362 F. Supp. 3d 864, 871 (S.D. Cal. 2019). As a result, the plaintiff, as "[t]he party asserting jurisdiction[,] bears the burden of establishing subject matter jurisdiction on a motion to dismiss for lack of subject matter jurisdiction." *DRAM*, 546 F.3d at 984.

**B.     Motion to Compel Arbitration**

"A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction" is subject to the Federal Arbitration Act ("FAA"). 9 U.S.C. § 2. The FAA confers on the parties involved the right to obtain an order directing that arbitration proceed in the manner provided for in a contract between them. 9 U.S.C. § 4. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). In deciding a motion to compel arbitration, the court "is limited to determining (1) whether a valid agreement to arbitrate exists [within the contract] and, if it does, (2) whether the agreement encompasses the dispute at issue." *Boardman v. Pac. Seafood Group*, 822 F.3d 1011, 1017 (9th Cir. 2016) (citing *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (brackets in original)).

/////

There is an "emphatic federal policy in favor of arbitral dispute resolution." *Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 652 (9th Cir. 2009) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 631 (1985)). As such, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Mitsubishi Motors Corp.*, 473 U.S. at 626 (citation omitted).

Pursuant to the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. An arbitration agreement may only "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Thus, "courts must place arbitration agreements on an equal footing with other contracts." *Id.* Accordingly, courts may not apply traditional contractual defenses, like duress and unconscionability, in a broader or more stringent manner to invalidate arbitration agreements and thereby undermine the FAA's purpose to "ensur[e] that private arbitration agreements are enforced according to their terms." *Id.* at 344 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 478 (1989)).

Although section four of the FAA provides for the filing of a motion to compel arbitration, courts have held that a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction "is a procedurally sufficient mechanism to enforce [an] [a]rbitration [p]rovision." *GT Sec., Inc. v. Klastech GmbH*, No. 13-cv-3090-JCS, 2014 WL 2928013, at *17 (N.D. Cal. June 27, 2014).

**C.   Motion to Stay**

A court's power to stay proceedings is incidental to the inherent power to control the disposition of its cases in the interest of efficiency and fairness to the court, counsel, and litigants. *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936). A stay may be granted pending the outcome of other legal proceedings related to the case in the interests of judicial economy. *Leyva v.*

1  *Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863–64 (9th Cir. 1979).  Discretion to stay a case is appropriately exercised when the resolution of another matter will have a direct impact on the issues before the court, thereby substantially simplifying the issues presented.  *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983).  In determining whether a stay is appropriate, a district court "must weigh competing interests and maintain an even balance."  *Landis*, 299 U.S. at 254–55.  "[I]f there is even a fair possibility that the stay . . . will work damage to some one else, the stay may be inappropriate absent a showing by the moving party of hardship or inequity."  *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) (citation and internal quotation marks omitted).

Under section 3 of the FAA, a court, "upon being satisfied that the issue involved . . . is referable to arbitration, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  Section 3, however, is not mandatory and the court "has discretion to dismiss under Rule 12(b)(6) if it finds that all of the claims before it are arbitrable."  *Salberg v. Massage Green Int'l Franchise Corp.*, No. 3:15-cv-02805-GPC-WVG, 2016 WL 3667154, at *2 (S.D. Cal. July 11, 2016) (citing *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 638 (9th Cir. 1988) and *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1060 (9th Cir. 2004) (holding that the district court properly exercised its discretion in dismissing an action where all of the claims were subject to arbitration)).

## DISCUSSION

**A.  Existence of a Valid Arbitration Agreement**

The parties to the underlying contract in this case reside in different countries.  Specifically, Custom is located in California and Imex is located in Canada.  (Doc. No. 8-1 at 2.)  The validity of agreements to arbitrate entered into between parties from different countries is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention").  *Maroc Fruit Bd. S.A. v. M/V Vinson*, No. 1:10-cv-10306-JLT, 2012 WL 2989195, at *2 (D. Mass. July 11, 2012).

/////

5

Article II § 1 of the Convention provides, in relevant part:

> Each Contracting State shall recognize an agreement in writing under which the parties undertake to subject to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

Furthermore, Article II § 2 of the Convention states:

> The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

The Convention is implemented by Chapter Two of the Federal Arbitration Act. *Al-Qarqani v. Chevron Corp.*, No. 18-cv-03297-JSW, 2019 WL 4729467, at *2 (N.D. Cal. Sept. 24, 2019) (citing 9 U.S.C. §§ 201–208). The Convention as set forth in Chapter Two requires, as a preliminary matter, that an arbitration clause be part of an "agreement in writing" in order to be enforceable. *Id.* An "agreement in writing" is defined in Article II, § 2 of the Convention as "'an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.'" *Id.* (quoting 9 U.S.C. § 201). "The modifying phrase, 'signed by the parties or contained in a series of letters or telegrams' applies to both 'an arbitral clause in a contract' and 'an arbitration agreement.'" *Bothell v. Hitachi Zosen Corp.*, 97 F. Supp. 2d 1048, 1051 (W.D. Wash. 2000) (citing *Kahn Lucas Lancaster Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 217 (2d Cir. 1999)). Accordingly, pursuant to the terms of the Convention, "both an arbitration clause in a contract or an arbitration agreement must be (a) signed by the parties or alternatively, (b) contained in a series of letters or documents to be enforceable." *Id.* at 1051–52 (citing *Lancaster*, 186 F.3d at 217–18).

"A court in the United States faced with a request to refer a dispute governed by Chapter Two to arbitration performs a 'very limited inquiry' into whether an arbitration agreement exists and falls within the Convention's coverage." *Bothell*, 97 F. Supp. 2d at 1051 (quoting *DiMercurio v. Sphere Drake Ins. Inc.*, 202 F.3d 71, 74 (1st Cir. 2000) (citations and footnotes omitted)). Because it is seeking to compel arbitration in this case, defendant Custom must carry the burden of demonstrating that it has met the Convention's jurisdictional requirements,

/////

6

including that there is an "arbitration agreement under the terms of the Convention." *Al-Qarqani*, 2019 WL 4729467, at *2 (quoting *Bothell*, 97 F. Supp. 2d at 1053).

As an initial matter, plaintiff EDC concedes that although it itself is not a signatory to the DRC, it has assumed the rights of Imex and is therefore equally bound by Imex's agreements with respect to dealings with defendant Custom. (Doc. No. 8-1 at 7.) The court now turns to whether the DRC falls within the coverage of the Convention and thus compels arbitration in this case. The Ninth Circuit has held that, in determining whether to issue an order compelling arbitration under the Convention, courts may not review the merits of the dispute but must limit their inquiry to determining whether:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-cv-1827-SI, 2011 WL 5325589, at *2 (N.D. Cal. Sept. 19, 2011) (quoting *Balen*, 583 F.3d at 654–55). Accordingly, the court will engage in that inquiry below.

First, the parties do not appear to dispute that Imex and Custom entered into a commercial relationship. (*See* Doc. No. 8-1 at 6) ("The Complaint shows on its face that the dispute is based on transactions involving foreign commerce between DRC Members Imex and Custom Produce.") Specifically, Imex and Custom's "defined legal relationship" was born out of the fact that they were both DRC members and consummated transactions for the sale and purchase of fresh fruit and vegetables. Second, the parties do not dispute that at least one party to the underlying contract is not a citizen of the United States because Imex is a Canadian corporation. (Doc. Nos. 8-1 at 6; 1 at 2.) Third, the parties do not dispute that if the DRC qualifies as a valid written agreement, then it provides for arbitration in Canada, which is a signatory to the Convention. (Doc. No. 8-1 at 6.) Therefore, for the purposes of the pending motion to compel arbitration, the parties do not dispute prongs two, three, or four of the standard outlined in the Ninth Circuit's decision in *Balen*. As such, this court need only determine whether there is an

1    agreement in writing within the meaning of the Convention.  *See Chloe Z Fishing Co. v. Odyssey*
2    *Re (London) Ltd.*, 109 F. Supp. 2d 1236, 1243 (S.D. Cal. 2000) ("The central disputed issue that
3    remains, therefore, is whether the [policies], viewed in light of the parties' business relationship,
4    constitute an 'agreement in writing' to arbitrate the 'subject of the dispute' under the
5    Convention.")

6         In its pending motion to compel arbitration, defendant Custom argues that at all times
7    relevant to the underlying contract at issue in this action, Custom and Imex were members of the
8    DRC.  (Doc. No. 8-1 at 3.)  Moreover, according to defendant, "[w]hen becoming a DRC
9    member, that member enters into a written arbitration agreement whereby the member agrees that
10   any dispute, controversy or claim with another member arising out of or in connection with any
11   transaction involving fresh fruits and vegetables shall be resolved <u>exclusively</u> in accordance with
12   the DRC's mediation and arbitration rules."  (*Id.*) (underlining in original).  Defendant concludes
13   that the DRC is a valid written arbitration agreement and falls within the Convention, thus
14   requiring that plaintiff's claims brought in this action be subject to arbitration.  (*Id.* at 10.)

15        In opposition, plaintiff EDC avers that there is simply no arbitration agreement signed by
16   Imex or plaintiff.  (Doc. No. 15 at 8.)  Plaintiff argues that the DRC is not the governing
17   agreement in this action.  (*Id.*)  While conceding that Imex and Custom are both members of the
18   DRC trade association, plaintiff advances that the transaction at issue in this case—i.e., the
19   contract for the sale of mandarins—is a separate agreement, which itself contains no arbitration
20   agreement.  (*Id.*)  Based upon this construction, plaintiff contends that the DRC's language is
21   irrelevant to the later contract, which was one solely between Imex and Custom.  (*Id.*)  According
22   to plaintiff, if defendant Custom "genuinely wanted to arbitrate disputes with Imex arising from
23   the parties' transactions in 2020, it should have negotiated that."  (*Id.* at 10.)  Plaintiff concludes
24   that Custom's motion to compel arbitration should therefore be denied "because it didn't
25   discharge its 'substantial' burden . . . of identifying 'an express, unequivocal' agreement to
26   arbitrate."  (*Id.* at 11) (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d
27   1136, 1141 (9th Cir. 1991)).
28   /////

The court is unpersuaded by plaintiff's arguments in this regard and concludes that the DRC qualifies under the Convention as a valid written arbitration agreement. Pursuant to the Convention, the court must recognize an agreement in writing "under which the parties undertake to submit to arbitration all or any differences which have arisen or may arise between them in respect of a defined legal relationship, *whether contractual or not*, concerning a subject matter capable of settlement by arbitration." *Chloe Z Fishing Co.*, 109 F. Supp. 2d at 1244 (emphasis added). Here, both Imex and Custom are members of the DRC—a defined legal relationship. (*See* Doc. No. 8-3 at 6, 8.) Custom has submitted to the court its signed membership agreement to join the DRC (Doc. No. 18-1 at 11) as well as Imex's signed membership agreement to do the same (*Id.* at 22). In those signed agreements, the parties explicitly agreed "that all disputes between me and/or my organization and any other member or members of the DRC shall be resolved exclusively pursuant to the Mediation and Arbitration Rules of the DRC." (*Id.* at 11.) Moreover, in the agreement forms, underneath the heading "Arbitration," it states that "I further specifically agree to submit any such disputes not resolved through mediation to arbitration in accordance with the said Dispute Resolution Rules and the agreement to arbitrate contained in Article [Two] thereof." (*Id.* at 14.) Article Two in turn confirms that the application of the DRC arbitration rules to disputes between members "is a condition of membership in the DRC" and "each member agrees that any dispute . . . arising out of or in connection with any transaction involving fresh fruits and vegetables . . . shall be resolved *exclusively* in accordance with these Rules as amended from time to time." (Doc. No. 8-3 at 34.) Notably, Article Two affirms that "[a]ny copy of a member's membership application provided by the Corporation shall be conclusive evidence of the member's agreement to arbitrate any dispute, controversy or claim as provided for in these Rules." (*Id.* at 35.) Article Two goes on to state, "[m]embers hereby consent to the Corporation releasing a copy of their membership application to the opposing party in any arbitration proceeding as necessary to provide evidence of the member's agreement to arbitrate for the arbitration process and for enforcement of the arbitration award, or both." (*Id.*) Lastly, under the heading "Consent to Disclosure of Agreement and other Information," the membership applications signed by both parties state "I hereby authorize the DRC to provide my

organization's Membership Application . . . to any other DRC member, arbitrator or court of competent jurisdiction who may require same as evidence of my agreement to submit to arbitration." (Doc. No. 18-1 at 14.)

The court concludes that the DRC falls squarely within the definition of an agreement in writing to arbitrate. Although the DRC is not related to any specific contractual dispute, it is clearly intended to apply generally to all disputes between the fruit and vegetable sellers and buyers who make up its membership. By applying for and gaining membership to the DRC, Imex and Custom agreed that any disputes between them related to the sale of fresh fruits or vegetables would be resolved exclusively pursuant to the arbitration rules set forth in the DRC application agreement.

The court recognizes that the arbitration agreement at issue in this case is not as obviously applicable as written agreements present in other cases that have addressed when the Convention governs. For instance, here the DRC was not explicitly incorporated or referenced in the underlying contract between Imex and Custom for the sale and purchase of mandarins. *See, e.g.*, *Allen v. Royal Caribbean Cruise, Ltd.*, No. 08-cv-22014, 2008 WL 5095412, at *5 (S.D. Fla. Sept. 30, 2008) (the written agreement requirement was satisfied when the arbitration agreement was contained in a separate document incorporated by reference into the main contract). Nor was the DRC specifically discussed by Imex and Custom during negotiations. *See, e.g.*, *Glencore Ltd. v. Degussa Engineered Carbons L.P.*, 848 F. Supp. 2d 410, 437 (S.D.N.Y. 2012) (finding that "the parties specifically communicated about the [agreements] containing the arbitration clause," supporting its applicability).[2] Nevertheless, the fact that the arbitration agreement here is not explicitly referenced in the underlying contract is not of any significant consequence because the

---

[2] The DRC suggests that the parties can enter into separate arbitration agreements so long as they do not conflict with the DRC rules. (Doc. No. 8-3 at 60) ("Unless the parties agree otherwise, the language of the arbitration shall be that of the documents containing the arbitration agreement between the parties.") Nonetheless, the DRC also explicitly provides for situations where no separate agreement is in place, as is the case here. (*Id.*) ("In the case of disputes between members where there is no separate arbitration agreement . . . , the language of the arbitration shall be the language of the principal agreement and supporting business documentation between the parties.")

DRC applies regardless. For example, under the heading of "Commencing the Arbitration" in the Dispute Resolution Rules of the DRC, it is provided that a statement of any claim shall include "a reference to any contract out of, or in relation to, which the dispute arises." (Doc. No. 8-3 at 48.) In other words, when a party submits a claim of arbitration to the DRC, they must list the contract that the dispute arises out of. This language would suggest that the DRC's arbitration agreement applies even if the contract underlying the dispute does not explicitly contain a separate arbitration clause or a reference to the DRC. In addition, plaintiff in this case has provided no authority in support of the proposition that the sales contract between Imex and Custom somehow supersedes the arbitration provisions of the DRC.[3]

Moreover, other courts have held that broader underlying arbitration agreements satisfy the requirements of the Convention, even if they are not explicitly included in the contract at issue. In this vein, the Second Circuit determined as much in the context of Bilateral Investment Treaties ("BIT"), which govern when a host country is bound under the Convention to arbitrate an investment dispute submitted by a foreign investor. *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 391–92 (2d Cir. 2011). The court in *Republic of Ecuador* held that Ecuador was bound by an agreement to arbitrate even though "[u]nlike the more typical scenario where the agreement to arbitrate is contained in an agreement between parties to the arbitration, here the BIT merely creates a framework through which foreign investors, such as Chevron, can initiate arbitration against parties to the Treaty." *Id.* The Second Circuit went on to hold that, in the end, "this proves to be a distinction without a difference, since Ecuador, by signing the BIT, and

---

[3] Plaintiff has cited to the district court decision in *Meduri Farms, Inc. v. Dutchtecsource B.V.*, No. 3:17-cv-906-SI, 2017 WL 6029606 (D. Ore. Dec. 5, 2017) in support of its argument that a later contract that does not incorporate a previous arbitration agreement does not qualify as an agreement in writing under the terms of the Convention. (Doc. No. 15 at 12.) However, the issue in *Meduri Farms* was that one of the parties had never agreed to a separate previous contract that contained the arbitration agreement, which rendered any such agreement unenforceable. *See Meduri Farms*, 2017 WL 6029606, at *5 ("If Meduri had conceded that the 332 document constitutes a binding contract between the parties, then DTS might have a persuasive argument that the parties had clearly and unmistakably agreed to delegate issues of arbitrability. Meduri asserts, however, that it rejected that offer by DTS and that it did not accept any offer by DTS until Meduri accepted the 355 document on September 19, 2015.") Obviously, the situation here is distinguishable in that Imex and Custom did enter into a valid arbitration agreement—the DRC—prior to their separate contract for the sale of mandarins.

1    Chevron, by consenting to arbitration, have created a separate binding agreement to arbitrate."
2    *Id.* While not precisely on point to resolution of the issue presented here, this decision strongly
3    supports the validity of underlying arbitration agreements that are not explicitly connected to a
4    specific contract dispute, like the DRC.
5          For all of the reasons stated above, the court concludes that there is a valid written
6    agreement to arbitrate here.  Moreover, that arbitration agreement covers disputes such as the one
7    at issue in this case:  disputes over the sale or purchase of fresh fruits and vegetables.  *See*
8    *Boardman*, 822 F.3d at 1017 (In deciding a motion to compel arbitration, the court "is limited to
9    determining (1) whether a valid agreement to arbitrate exists [within the contract] and, if it does,
10   (2) whether the agreement encompasses the dispute at issue.")  Accordingly, the court will grant
11   defendant's motion to compel arbitration.
12   **B.     Whether the Agreement is Unenforceable or Incapable of Being Performed**
13         When a party in a suit subject to the Convention moves to compel arbitration, the first step
14   is for the court to determine the existence of an arbitration agreement which falls under the
15   Convention.  *See Chloe Z Fishing Co., Inc.*, 109 F. Supp. 2d at 1241.  If the court finds the
16   existence of such an agreement, it must order arbitration unless it finds the agreement "null and
17   void, inoperative or incapable of being performed" under the Convention.  *Id.*  Only
18   internationally recognized contract formation defenses or public policy concerns of the forum
19   nation can render a valid agreement to arbitrate unenforceable under Article Two of the
20   Convention.  *Mullen Technologies, Inc. v. Qiantu Motor (Suzhou) LTD.*, No. 3:19-cv-1979-W-
21   AHG, 2020 WL 3573371, at *3 (S.D. Cal. July 1, 2020).  Here, plaintiff has advanced the
22   argument that the arbitration agreement is null and void because any arbitration would be barred
23   by the nine-month statute of limitations applied by the DRC. (Doc. No. 15 at 18.)  Plaintiff
24   emphasizes that it would suffer extreme hardship should the court stay or dismiss this case.
25         Plaintiff argues that even if the DRC qualifies as a valid written arbitration agreement, the
26   court should not abide by that agreement because plaintiff will thereby be subject to hardship and
27   surprise. (*Id.* at 16.)  Plaintiff notes that it attempted to engage in arbitration with the DRC, but
28   its efforts were rejected because plaintiff is a non-member to the DRC agreement, unlike Imex

1     and Custom. (*Id.*) Furthermore, plaintiff avers that even if it could initiate arbitration, its claims

2     would be barred because the DRC requires that any claims be submitted within nine months of a

3     dispute arising. (*Id.*) In other words, plaintiff concludes, "if [the] DRC's rules are deemed

4     incorporated into the parties' 2020 transactions, EDC and Imex will be deprived of *any* remedy in

5     *any* forum." (*Id.*) (emphasis in original). Moreover, plaintiff notes that if it is prevented from

6     proceeding with this lawsuit, that will void Imex's insurance coverage because the assignment

7     agreement provides that Imex must repay its insurance proceeds if EDC is "not entitled . . . to

8     continue or maintain a legal proceeding in respect of [Custom's] Debt, or if any such action . . . is

9     stayed or dismissed." (*Id.*)

10        In response, defendant cites the "Notice of Dispute Submission" issued by the DRC to

11    plaintiff, in which the DRC stated that EDC was not a member of the DRC "nor has it addressed

12    the issue of non-member fees." (Doc. No. 18 at 8.) Defendant points out that the DRC had sent

13    email explanations and requested phone conversations with plaintiff's counsel in order to

14    understand plaintiff's request, but plaintiff's counsel has demanded that the DRC submit its needs

15    in writing. (*Id.*) Defendant argues it is clear based on the foregoing "that EDC did not want to

16    arbitrate this matter, as EDC's attorney could not be bothered to even speak with the DRC's

17    representative on the phone regarding the arbitration notice." (*Id.*) Defendant further asserts that

18    "[i]t appears that the DRC was making efforts to accept this dispute, but was hung up on the

19    membership and fees issue." (*Id.*) According to defendant, "[r]ather than join the DRC, pay

20    membership fees, and avail itself of the DRC's dispute resolution procedures, EDC took a gamble

21    and filed this action in District Court." (*Id.*) Lastly, defendant contends that any hardship

22    suffered by non-party Imex by having to pay its insurance proceeds back to EDC is a result of its

23    own carelessness in assigning its rights to EDC despite provisions in the assignment agreement

24    that stated the following as prerequisites to such payment:

- [Y]ou have duly performed and fulfilled all of your obligations under the Contract and are not aware of any: provision of the Contract; or other matter, which could restrict, reduce, prohibit or adversely affect our ability to collect the Debt or enforce any rights or remedies with respect to the Debt;

13

- You will provide to us all agreements, correspondence and all other information relating to or evidencing the Contract or the Debt;

- You must, immediately upon demand, repay the amount of the Claim Payment to us as well as pay to us all damages, interest, costs, fees, charges or other expenses we incur in relation to the Claim Payment, the recovery of the Debt and this Agreement if:

    . . .

    o any representation or warranty you made in this Agreement is incorrect or false; [or]

    . . .

    o we are not entitled to commence, continue or maintain a legal proceeding in respect of the Debt, or if any such action or award rendered in the legal proceeding is stayed or dismissed as a result of any of your action or omission.

(Doc. No. 15-5 at 3–5.)

The court finds defendant's arguments to be persuasive with regard to any potential hardships plaintiff or Imex may suffer from the repaying of the insurance proceeds. Although this order will certainly cause those parties some hardship in that they will be required to pursue arbitration and Imex may potentially have to respond to a claim for repayment by EDC, those appear to be issues of their own making. Imex, as a sophisticated party, was aware of its membership in the DRC. More importantly, EDC appears to have also been aware of Imex's membership in the DRC upon first signing the assignment agreement in that EDC signed the agreement 29 days after it had filed a Notice of Dispute with the DRC. (*See* Doc. No. 15-5 at 7.) Perhaps EDC assumed that the DRC would not apply to it, thus leading it to file its initial complaint in this court on April 23, 2021.[4] Regardless, hardship alone is not a compelling reason to ignore an explicit arbitration agreement, particularly in light of the fact that federal policy favoring arbitration applies with "special force in the field of international commerce."

---

[4] Notably, the DRC would appear to allow for the joinder of additional parties to an arbitration, such as EDC in this case. In this regard, the Dispute Resolution Rules state that a non-party to the arbitration may file an application with the DRC to join the arbitration provided that "the additional party to be joined is *prima facie* bound by the arbitration agreement." (Doc. No. 8-3 at 50.)

14

*Mitsubishi Motors Corp.*, 473 U.S. at 631; *see also Oriental Commercial and Shipping Co., Ltd. v. Rosseel, N.V.*, 609 F. Supp. 75, 78 (S.D.N.Y. 1985) (holding that an agreement is only "null and void" when susceptible to internationally recognized defenses such as duress, mistake, or waiver, or when it contravenes fundamental policies of the forum nation).  Accordingly, plaintiff's arguments with respect to hardship and surprise will not alter the court's decision to grant defendant's motion to compel arbitration.

With respect to any potential statute of limitations bar, plaintiff's arguments are somewhat more persuasive.  When an agreed upon forum is not available to hear the dispute, "'then a petition to compel arbitration may not be granted.'" *Mirza v. Cachet Hotel Grp. Limited Cayman L.P.*, No. 2:17-cv-07140-RGK-KS, 2017 WL 5593508, at *5 (C.D. Cal. Nov. 17, 2017) (quoting *Provencio v. WMA Securities, Inc.*, 125 Cal. App. 4th 1028, 1032 (2005)).  Such a risk exists here if the DRC statute of limitations indeed entirely prevents plaintiff from pursuing this claim in arbitration.  However, plaintiff has not shown that the DRC will not arbitrate these claims based on the statute of limitations.  For one thing, the DRC Dispute Resolution Rules state that a Notice of Dispute must be filed with the DRC "within nine (9) months of when the claim arose or within nine (9) months of when the claimant ought reasonably to have known of its existence."  (Doc. No. 8-3 at 35.)  Plaintiff filed its Notice of Dispute with the DRC on March 10, 2021.  (Doc. No. 8-2 at 5.)  In that notice, plaintiff alleged that Imex delivered weekly shipments to Custom until July 2020.  (*Id.* at 5–6.)  Taking plaintiff and Imex at their word, the court cannot discern how their claims would become ripe prior to July 2020.  Only eight months passed from July 2020 until March 10, 2021.  It thus appears likely that the statute of limitations would *not* bar arbitration because the Notice of Dispute was filed within nine months of when the claims arose.  Additionally, the DRC "may, at any time, extend or abridge a period of time required in these Rules, other than a period of time fixed or determined by an arbitrator or mediator." (*Id.* at 36.)  Accordingly, at worst, plaintiff or Imex may petition the DRC for an extension of the limitations period based on the complicated history of this dispute.  Absent a showing by plaintiff that those solutions would fail to prevent a statute of limitations bar to arbitration, the court cannot conclude that the required arbitration is incapable of being conducted.

C. **Motion to Stay**

In a federal suit brought upon an issue referable to arbitration under a written agreement, the court in which the suit is pending "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Such a decision is "a matter largely within the district court's discretion to control its docket." *Genesco, Inc. v. T. Kakiuchi &Co., Ltd.*, 815 F.2d 840, 856 (2d Cir. 1987) (citing *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20, n.23 (1983)). Here, there remains at least some degree of risk that the DRC will not be able to hear the arbitration because of the applicable nine-month statute of limitations. *See Mirza*, 2017 WL 5593508, at *5. Given that risk, the court finds it prudent to merely stay, rather than dismiss this civil action, pending the resolution of arbitration. *See id.* (declining to compel arbitration where it was no longer possible for the parties to arbitrate their dispute in their agreed upon forum, thus rendering the arbitration agreement incapable of being performed and void). Nonetheless, the court cannot permit this case to move forward in light of the mandatory arbitration agreement and the risk of inconsistent rulings from the court and the arbitrator.

Moreover, a stay of this case is particularly appropriate given the parties' agreement that the arbitrator, and not the court, should determine whether the arbitrator has jurisdiction over the dispute. (*See* Doc. No. 8-3 at 58) ("The arbitral tribunal may rule on its own jurisdiction, including ruling on any objections with respect to the existence, scope or validity of the arbitration agreement(s), including whether all the claims, counterclaims, and counterclaim with setoffs made in the arbitration may be determined in a single arbitration.") This clause from the DRC's Dispute Resolution Rules is in line with the conclusion reached by courts that have held "where the parties' agreement to arbitrate includes an agreement to follow a particular set of arbitration rules . . . that provide for the arbitrator to decide questions of arbitrability, the presumption that courts decide arbitrability falls away, and the issue is decided by the arbitrator." *Bank of Am., N.A. v. Micheletti Family P'ship*, No. 08-cv-02902-JSW, 2008 WL 4571245, at *6 (N.D. Cal. Oct. 14, 2008) (collecting cases).

/////

Accordingly, the court will grant defendant's motion to stay this case. If the DRC later determines that this case is barred by its applicable statute of limitations and the parties—despite their good faith efforts to do so—are unable to arbitrate this dispute in their agreed upon forum, the court will consider supplemental motions and briefing addressing whether this action should proceed on plaintiff's complaint.

## CONCLUSION

For the reasons explained above:

1. Defendant's motion to compel arbitration in accordance with the terms of the DRC (Doc. No. 8) is granted;

2. Defendant's motion to dismiss this case (Doc. No. 8) is denied;

3. Defendant's alternative motion to stay this case pending the resolution of arbitration (Doc. No. 8) is granted;

4. This case is stayed in its entirety pending arbitration, subject to its re-opening by the parties at the conclusion of arbitration or upon a ruling by the DRC that it does not have jurisdiction to hear this dispute; and

5. The parties are directed to notify the court within fourteen (14) days of any decision by the DRC with respect to arbitration so that the court may either close this case or implement a new scheduling order with regard to future motions.

IT IS SO ORDERED.

Dated: __**June 7, 2022**__                              _____
                                                          UNITED STATES DISTRICT JUDGE